UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Alan E Fischer III
803 College Ave
Lakeland, FL 33801

AND

John Does 1-10,000

    Plaintiffs,

v.

DISTRICT OF COLUMBIA,
400 6th Street, NW, Washington, DC 20001,

US CAPITOL POLICE DEPARTMENT,
c/o] 119 D St NE, Washington, DC 20510

DC METROPOLITAN POLICE DEPARTMENT,
c/o 400 6th Street, NW, Washington, DC 20001,

ERIC WALDOW, in his individual capacity,
c/o] 119 D St NE, Washington, DC 20510

THOMAS LOYD, in his individual capacity,
c/o] 119 D St NE, Washington, DC 20510

JOHN DOE USCP OFFICERS 1-50,
in their individual capacities,

AND

ROBERT GLOVER, in his individual capacity,
c/o 400 6th Street, NW,
Washington, DC 20001,

DANIEL THAU, in his individual capacity,
c/o 400 6th Street, NW, Washington, DC 20001,

JAMES CRISMAN, in his individual capacity,
c/o 400 6th Street, NW, Washington, DC 20001,

JOHN DOE MPD OFFICERS 1-50,
in their individual capacities,

Case: 1:24-cv-00044 JURY DEMAND
Assigned To : Cooper, Christopher R.
Assign. Date : 1/5/2024
Description: Pro Se Gen. Civ. (F-DECK)

**JURY TRIAL DEMANDED
CLASS ACTION**



AND

STEVEN SUND, in his individual capacity,
c/o] 119 D St NE, Washington, DC 20510

YOGANANDA PITTMAN, in her individual capacity,
c/o] 119 D St NE, Washington, DC 20510

MURIEL BOWSER, in her individual capacity

NANCY PELOSI, in her individual capacity

US CAPITOL POLICE BOARD,
119 D St NE, Washington, DC 20510

                    Defendants.

---

## COMPLAINT

### THE PARTIES

1. Plaintiff Alan E. Fischer III is a United States Air Force Disabled Veteran residing in Florida. Mr. Fischer III suffers from PTSD from a previous incident of police brutality that occurred in Tampa, FL in July of 2019.

2. Plaintiff Mr. Fischer III files this Class Action suit pro-se under 42 USC 1983 on behalf of himself and others yet unknown. Members of the Class Action suit are citizens and residents of the United States, and are located in and around the 50 states of the United States, who's civil rights were violated on the West Plaza of the US Capitol on January 6th, 2021 between hours including, but not limited to, 1:00pm to 3:00pm.

3. None of the plaintiffs who are members of this Class Action destroyed or attempted to destroy property, assaulted or attempted to assault any individuals, rioted, or in any way would have appeared to the police to have been breaking the law before they were attacked by police.

4. Defendants include: The City of Washington DC, The US Capitol Police, Senior Leadership of the US Capitol Police, and subordinate officers; The DC Metropolitan Police,

Senior Leadership of the DC Metropolitan Police, and subordinate officers; The Mayor of DC, The Speaker of the House, and the US Capitol Police Board for violation of their First, Fourth, Fifth, Eighth, and Fourteenth Amendment Civil rights guaranteed under the US Constitution's Bill of Rights.

## Statement of Facts

1. On January 6th, 2021, Plaintiffs separately convened in Washington, DC to exercise in First Amendment protected speech and assembly, to attend a speech by President Donald Trump at the Ellipse, to attend permitted protests on the US Capitol grounds, to protect fellow Americans from the threat of attack by counter-protesters including but not limited to ANTIFA and BLM, and to join in the various events which brought millions to DC.

2. At the massively attended speech by President Trump at the Ellipse, President Trump instructed speech goers multiple times, starting at 12:16pm, that at the conclusion of the speech they would walk down Pennsylvania Avenue with President Trump himself to the Capitol to cheer on the Senators and Congressmen and women who were expected to object to the certification of electoral votes in certain states where election fraud was suspected.

3. Protesters from the Trump speech began leaving the speech early and walking from the Ellipse, outside the White House, down Pennsylvania avenue which terminates at the US Capitol's West grounds.

4. At approximately 1:00pm on January 6th, the same time the election certification began on the House Floor, protesters assembled on the West Capitol grounds and began filling up the Capitol's West Plaza to peacefully exercise their First Amendment rights.

5. There were multiple permitted events on Capitol grounds in lots surrounding the US Capitol on all sides, but no clearly marked restricted zones around the Capitol demarcating a restricted area for the January 6th Certification of Electoral votes, or from these USCP permitted protest areas. There were few lightweight plastic "snow" fences blocking off the West Capitol

grounds from the street affixed with "AREA CLOSED" signs, however this fencing and signage was installed in accordance with a USCP closure on September 7th for construction of the Inaugural Stage, and not the January 6th Certification (a). Permits issued affirmed the people's "right to visit the Nation's Capitol, to call at the offices of Representatives and Senators, to observe public proceedings of Congress, and to petition the Congress for redress of grievances."

    a. https://www.uscp.gov/media-center/press-releases/access-west-front-us-capitol-restricted-inauguration-platform

6. Although this "AREA CLOSED" signage existed on the West Capitol grounds on the morning of January 6th, it was pulled down and removed prior to 1:00pm. Therefore, no protesters assembling on the West Plaza, except for the very first few, would have ever seen it.

7. Immediately following protester's arrival on the West Plaza at approximately 1:00pm; USCP Deputy Chief Waldow ordered the USCP Civil Disturbance Unit's Less Lethal Team into place on the West Terrace, directly above protesters on the Lower West Plaza.

8. At approximately 1:06pm, USCP Deputy Chief Waldow ordered the USCP CDU Less Lethal team to fire into the crowd, demanding they "LAUNCH" three times. Waldow can be heard in this radio transmission claiming to have "given warnings about chemical munitions" to protesters. Video footage released since shows no sign of any warning given to protesters. Nor does it show any attempt to provide exit routes, give time for the crowd to understand an order to disperse, or verify warnings are heard by the crowd with officers positioned at the back of the crowd; which are all mandated by the DC First Amendment Assemblies Act, DC 5-331.07, referred to hereafter as the DC FAAA.

9. At approximately 1:06pm, after Waldow's order, USCP Inspector Loyd ordered the USCP CDU Less Lethal team to fire into the crowd with a hand signal pointing into the crowd. Loyd who was standing within feet of Waldow would have known there were no audible warnings given to notify, instruct or disperse the newly formed crowd; yet reiterated Waldow's illegal order and directed the Less Lethal team's fire.

10. At approximately 1:07pm, members of the USCP CDU Less Lethal team to fired into the crowd, striking an innocent and peaceful protester in the face. The round penetrated and lodged itself in the victim's cheek, causing significant blood loss.

11. The crowd, including Plaintiff Fischer III, was caught off guard by the attack and rushed to aid the victim. Some protesters in the vicinity became agitated by the assault, and began yelling about the shooting of the victim. Few protesters began pushing against USCP officers on the police line in front of the victim.

12. At approximately 1:09pm, USCP Deputy Chief Waldow gave another order to the USCP CDU Less Lethal team. Waldow can be heard in this radio transmission claiming that he "continued to give multiple warnings about chemical munitions being released" and that "they are not dispersing." Footage shows no sign of any warning, or dispersal order given to the crowd.

13. At approximately 1:10pm, members of the USCP CDU Less Lethal team fired into the crowd with multiple munitions a second time, striking their own USCP officers, and a protester's hand.

14. At approximately 1:12pm, DC MPD's Special Operations Division officers began arriving on the Lower West Plaza and engaging with protesters with physical violence, using baton strikes, OC chemical irritants, and "ECD" taser rounds. DC MPD's officers would go on to fire dozens to hundreds of munitions into crowds over the next hour, and violate DC MPD policy; using deadly force by beating protesters over the head with baton strikes, and firing mortars directly at their bodies.



Pepper spray is used during a clash between protesters and police officers at the U.S. Capitol in Washington on Jan. 6, 2021. (Leo Shi/The Epoch Times)

**THE EPOCH TIMES**

15. DC MPD Sgt Thau, among these arriving officers, immediately began calling for "blast munitions", spraying non-violent protesters with OC chemical irritants, and using "ECD" taser rounds as offensive weapons to injure protesters with no intent to arrest them.

16. At approximately 1:17pm, DC MPD Sgt Thau demanded Deputy Chief Waldow, and Inspector Loyd to order the USCP Less Lethal team to fire into the crowd again, pointing and yelling "WE NEED THEM" and "LET'S GO. FUCKING SHOOT THEM. SHOOT! SHOOT!"

17. At approximately 1:18pm, USCP Deputy Chief Waldow gave the order for the USCP Less Lethal team to fire a third time into the crowd. The Less Lethal team fired at least 8 munitions at a group of entirely peaceful protesters standing near a large wooden cross. Munitions struck multiple protesters and the wooden cross.



18. At 1:18pm, one pepperball round struck peaceful protester Plaintiff Fischer III in his head, exploding against his left temple. This shooting of Fischer was certainly an instance of deadly force. (On February 2nd 2023, in trial testimony in a January 6th criminal case, USCP Officer Shae Cooney from the Less Lethal Team admitted to defense counsel in cross-examination that; it is a violation of policy to aim at the face of protesters, and a pepperball striking someone in the temple could possibly cause death.)

19. At 1:24pm, DC MPD Commander Robert Glover authorized MPD Officer Crisman, who was standing by and holding 2 "stingball grenades" to escalate force to explosive munitions, yelling "DEPLOY DEPLOY!" Commander Glover gave no warning to the crowd before authorizing this escalation of force.

20. MPD Officer Crisman responded within a few seconds by throwing the two stingball grenades deep into the crowd with no intended target.

21. Between 1:32pm-1:36pm, in the span of about 4 minutes, MPD Officer Crisman threw

thirteen explosive stingball munitions deep into the crowd with no intended target.

22. Between the first grenades at approximately 1:20pm, and 2:30pm; MPD officers fired dozens, if not hundreds of explosive and projectile munitions into the crowd including but not limited to; stingball grenades, 40mm mortars, CS gas canisters, burning smoke munitions and more.

23. At 1:32pm, Sgt Thau ordered Officer Crisman to stop throwing grenades into the crowd, saying "it's just going to make things worse", "stop", "hold fire."

24. Then, at 1:33pm, MPD Sgt Thau pulled out a "hot burning smoke grenade" and threw it into the crowd. Thau was warned by fellow officers that the munition was a "burner" before throwing it.

25. At 1:34pm, MPD Sgt Thau pulled out a "Triple Chaser CS gas canister" to throw, and was then reprimanded by DC MPD Officer Tara Tindall that he "just threw smoke: "It was a burning munition","you give them three chances, why would you?" Referencing the DC FAAA.

26. At 1:49pm, DC MPD Commander Glover officially declares the protest on the West Plaza of the US Capitol a "riot."

27. At 2:18pm, Sgt Thau and Sgt Edwards of the DC MPD make an admission to one of their supervisors that their munitions are "hitting innocent people", and that they're angering and inciting ten protesters for every one they hit, that they're "multiplying them by hitting them."

28. At approximately 2:03pm, the DC MPD gave the first FAAA mandated warning with a single LRAD amplification device, which transmitted warnings that a failure to disperse would subject protesters to arrest. Bodycam footage shows that the amplification system was rendered obsolete and did not meet the standard of "clearly audible" as the warnings could not be heard by anyone more than a few feet away from the device. By this time, the crowd of thousands of people on the West Capitol Plaza and grounds was far too loud for the single LRAD to be heard or even close to sufficient, and no other elements of the DC FAAA, such as clear dispersal routes, or officers positioned at the back of the crowd were followed.

29. The use of impact projectiles by USCP on the West Plaza, and other locations around the US Capitol violated the USCP CDU Operational Plan on January 5th, 2021, which stated that an announcement of unlawful assembly with civil disorder would be required, and that "impact projectiles would not be fired indiscriminately into crowds." (a)

    a. https://s3.documentcloud.org/documents/23710582/us-capitol-police-cdu-operational-plan-for-jan-6-2021.pdf

30. On January 6th, USCP Chief Steven Sund was negligent in his authority over Capitol security when he was missing in action during the Capitol protest. He established no command or control over the situation at the US Capitol as his USCP officers and DC MPD officers escalated a protest into a riot. Sund instead spent the entire time this was occurring on the phone with other agencies, instead of actively commanding his police force and controlling the situation.

31. On January 6th, USCP Assistant Chief Yogananda Pittman was negligent and showed reckless disregard in her authority over Capitol security when she was missing in action during the Capitol protest. Pittman was derelict in her duty to control the situation and gave no orders to USCP to control the situation to ensure the safety of protesters, officers or members of Congress and their staff. On January 6th, 2021, while the protest escalated and officers were in dire need of leadership and direction, the Assistant Chief remained inactive off-site in the US Capitol Command Center. Pittman was nowhere to be found throughout the day, and failed to establish and maintain effective command and control of the Capitol. Pittman failed to prepare the US Capitol and officers under her command prior to January 6th, 2021, while knowing about intelligence that three million protesters might be attending the January 6th, 2021 events.

32. Prior to January 6th, Mayor Muriel Bowser was negligent and showed reckless disregard in her authority over DC and the Capitol's security by making an informed decision to deny the presence of National Guard troops, after repeated authorization by President Donald Trump, who could not authorize deployment of military forces on American soil without her co-authorization.

33. Prior to January 6th, Speaker Nancy Pelosi was negligent and showed reckless disregard in

her authority over Capitol security in the days leading up to the January 6th, 2021 protests. Although her chief of staff Jamie Fleet testified that they had begun planning for January 6th protests in the summer of 2020, Nancy and her staff decreased US Capitol security measures in the days leading up to the protest despite objections from USCP and Capitol Sergeants at Arms, and denied 10,000 National Guard troops to protect the US Capitol. On January 6th, Nancy Pelosi waited 71 minutes to deploy the National Guard to the US Capitol although their presence was desperately needed to maintain order.

34. On January 6th, DC MPD Commander Glover illegally authorized explosive munitions be fired into crowd, with no warnings. He then took part in the assault by donning a gas mask, and a 40mm mortar launcher. Glover fired more than a dozen 40mm mortar rounds at protesters, further escalating the situation instead of de-escalating and taking affirmative command and control of the situation and his officers.

35. Prior to January 6th, multiple officers under MPD Commander Glover's command on the West Plaza, including Thau and Crisman, were defendants in civil litigation for the exact same conduct, violating the FAAA with explosive munitions. The DC MPD, and the city of DC, as well as Commander Glover, also a recent defendant, were grossly negligent and displayed reckless indifference by allowing these officers to again violate protester's civil rights and incite a riot on January 6th, 2021.

36. The US Capitol Police displayed gross negligence and reckless indifference by failing to follow established protocols for managing large protests established before January 6th 2021, and allowing officers to commit the first assaults inflaming the crowd. The police response on January 6th, 2021 to First amendment demonstration was unequal, compared with their handling of frequent Capitol protests and incursions in years past, specifically with protests and Capitol breaches by Democrat activists in 2016 and 2018.

37. The US Capitol Police board, the entity vested with the oversight of the security and policing operations of the U.S. Capitol, displayed a gross negligence in their duty to ensure the

safety of both the public and officers on the ground during the protest. The Board, in its supervisory role, failed to create, implement, and enforce rigorous training protocols and operational guidelines that would protect the rights of peaceful protesters.

38. Post January 6th, 2021, The Capitol Police Board intentionally suppressed and failed to disclose vital video evidence from the day of the protest. This evidence was crucial to plaintiff's ability to assert and prove their civil rights claims, as well as defend themselves in criminal proceedings, showcasing the specific instances of excessive force and other constitutional violations by law enforcement personnel. The Board's deliberate act of suppressing evidence directly infringed upon plaintiff's rights to a fair and just legal process, making it substantially more challenging for them to establish his claims and potentially seek redress for the violations he endured. The withholding of such pivotal evidence further entrenched a system of unaccountability and obfuscated the truth, preventing plaintiffs from fully realizing their rights and remedies under the law. Furthermore, in a display of stark contrast to their justification of withholding said footage for "security reasons," the Board selectively provided access to HBO and a partisan Congressional committee, allowing selected footage to be aired on national television. This selective release, catering to certain political interests while depriving the plaintiff and others of crucial evidence, infringes upon the plaintiff's right to a fair and just legal process. Such actions further suggest an attempt to manipulate the narrative and obstruct justice, while leaving the plaintiff and others similarly situated without the means to substantiate their legal claims.

DATE: January 5th 2023
SIGNED: *[signature]*