**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **ALAN E. FISCHER III, et al.**, | |
| Plaintiffs, | |
| v. | Case No. 24-cv-00044 (CRC) |
| **DISTRICT OF COLUMBIA, et al.**, | |
| Defendants. | |

## <u>MEMORANDUM OPINION</u>

Plaintiff Alan E. ("AJ") Fischer III was indicted on seven criminal charges—including several violent felonies—due to his participation in the riot that took place at the U.S. Capitol on January 6, 2021.  See United States v. Fischer, No. 22-cr-00011 (RJL), ECF No. 54 (D.D.C. May 25, 2022).  Among other alleged conduct, Fischer joined a group of rioters that physically confronted law enforcement officers protecting the Capitol building in the "tunnel" connecting the Lower West Terrace of the Capitol to the interior of the Capitol building, where some of the worst violence took place that day.  See ECF 13-1 (Affidavit in Support of Fischer's Arrest Warrant) ¶¶ 21–29 (including still photographs).  He was also accused of hurling a traffic cone, a pole, and multiple chairs at police officers.  Id. ¶¶ 30–33 (same).  Fischer was awaiting trial for his actions when he and some 1,500 other January 6th defendants were pardoned by President Trump.

Seeking to turn the tables against the law enforcement personnel who defended the Capitol, Fischer filed this putative class action on behalf of himself and thousands of other participants in the events of January 6th.  He alleges First, Fourth, Fifth, and Fourteenth Amendment violations against the District of Columbia, the D.C. Metropolitan Police

Department, the U.S. Capitol Police, the U.S. Capitol Police Board, and various District and federal officials in their official and individual capacities.  All the defendants moved to dismiss Fischer's complaint, which Fischer then moved to amend.  For the reasons explained below, the Court will grant the defendants' motions to dismiss and deny Fischer's motion to amend.

## I.    Background

### A.  Factual Background

Mr. Fischer was at the Capitol on January 6, 2021, and recounts the events from his perspective.  The Court draws the following factual background from his complaint, taking as true all well-pled factual allegations, as it must on a motion to dismiss.  Peek v. SunTrust Bank, Inc., 313 F. Supp. 3d 201, 203 (D.D.C. 2018) (Cooper, J.).  Suffice it to say, however, that Fischer's account differs meaningfully from the version of events familiar to the Court from its experience overseeing scores of January 6th prosecutions, including eight trials.

In Fischer's telling, on January 6, 2021, "Plaintiffs" gathered in Washington, D.C., to (1) attend a speech by President Donald Trump at the Ellipse, (2) protest at the Capitol, and (3) "protect fellow Americans from the threat of attack by counter-protesters including but not limited to ANTIFA."  See ECF 22-1 ("Am. Compl.") ¶ 7.  He claims that, despite the anticipated crowd, D.C. Mayor Muriel Bowser "mad[e] an informed decision to deny the presence of National Guard Troops[] . . . after repeated authorization by President Donald Trump."  Id. ¶ 39.

At approximately 1:00 pm that day, around the time then-Vice President Mike Pence began the process of certifying the results of the 2020 election, a crowd from President Trump's "massively attended" speech began to assemble on the Capitol's West Plaza to "cheer on" the members of Congress who were expected to object to the election's certification.  Id. ¶¶ 8–10. The crowd moved into areas that Fischer acknowledges had been closed off for months, but he

claims any signage indicating these restrictions had been removed before the "demonstrators"

arrived, so none "except for the very first few, may have ever seen it."  See id. ¶¶ 10–12.

Fischer alleges that, as soon as the demonstrators arrived at the West Plaza, U.S. Capitol

Police ("USCP") Deputy Chief Eric Waldow ordered a USCP unit into place on the West

Terrace above the crowd on the Lower West Plaza.  Id. ¶ 13.  According to Fischer, Deputy

Chief Waldow then directed USCP to "launch," *i.e.*, fire into the crowd, three times, with USCP

Deputy Chief Thomas Loyd giving the same order via hand signal almost immediately thereafter.

Id. ¶¶ 14–15.  Fischer asserts that Deputy Chief Waldow did not give any warning or attempt to

provide exit routes before ordering the USCP team to fire.  Id. ¶ 14.

Fischer claims USCP fired and struck "an innocent and peaceful protester in the face."

Id. ¶ 16.  He alleges that "[t]he crowd . . . was caught off guard by the attack and rushed to aid

the victim."  Id. ¶ 17.  Fischer concedes that the crowd "became agitated . . . and began yelling

about the shooting of the victim."  Id.  Some protesters "began pushing against U.S. Capitol

Police officers on the police line in front of the victim."  Id.  USCP, at Deputy Chief Waldow's

direction, fired again because the crowd was not "dispersing."  Id. ¶ 18.  Fischer disputes

whether any warning or dispersal order was given beforehand.  Id.

Fischer alleges that, a few minutes later, D.C. Metropolitan Police Department ("MPD")

officers arrived at the scene, where they began "engaging with protesters with physical violence,

using baton strikes, OC chemical irritants, and 'ECD' taser rounds."  Id. ¶ 20.  He claims MPD

officers "fire[d] dozens to hundreds of munitions into crowds over the next hour," "beat[]

protesters over the head with baton strikes, and fir[ed] grenades and mortars directly at their

bodies."  Id.

He also points to the alleged actions of several specific MPD officers.  For example,

MPD Commander Robert Glover authorized MPD Officer James Crisman to deploy "stingball

grenades" into the crowd, which Crisman allegedly did repeatedly without warning.  Id. ¶¶ 25–

27.  Eventually, Fischer claims, MPD Sergeant Thau told Officer Crisman to stop throwing

grenades because "it's just going to make things worse," before Thau himself threw a grenade

into the crowd, only to be reprimanded by D.C. Metropolitan Police Officer Tara Tindall.  Id.

¶¶ 29–31.

Fischer claims Sergeant Thau also "call[ed] for 'blast munitions,'" "spray[ed] non-violent

protesters with OC chemical irritants," and "us[ed] 'ECD' taser rounds as offensive weapons to

injure protesters with no intent to arrest them."  Id. ¶ 21.  He says Sergeant Thau "demanded"

Deputy Chiefs Waldow and Loyd order USCP to fire into the crowd again, which Waldow did,

and USCP then fired at least eight munitions "at a group of entirely peaceful protesters."  Id.

¶ 22.  Fischer himself claims to have been struck in the head by a pepperball round.  Id. ¶ 24.

B.  Procedural Background

The United States indicted Fischer for seven offenses for his conduct on January 6th—

namely violations of 18 U.S.C. §§ 231(a)(3) (Civil Disorder), 111(a)(1) and (b) (Assaulting,

Resisting, or Impeding Certain Officers Using a Dangerous Weapon), 1752(a)(1) and (b)(1)(A)

(Entering and Remaining in a Restricted Building or Grounds with a Deadly or Dangerous

Weapon), 1752(a)(2) and (b)(1)(A) (Disorderly and Disruptive Conduct in a Restricted Building

or Grounds with a Deadly or Dangerous Weapon), 1752(a)(4) and (b)(1)(A) (Engaging in

Physical Violence in a Restricted Building or Grounds with a Deadly or Dangerous Weapon);

and violations of 40 U.S.C. §§ 5104(e)(2)(D) (Disorderly Conduct in the Capitol Grounds or

Buildings), 5104(e)(2)(F) (Act of Physical Violence in the Capitol Grounds or Buildings).  See

<u>United States v. Fischer</u>, No. 22-cr-0011 (RJL), ECF No. 54 (D.D.C. May 25, 2022) (Second Superseding Indictment).  Fischer pled not guilty, <u>id.</u> at March 24, 2022 Minute Entry, and the indictment against him was ultimately dismissed due to President Trump's pardons of those involved with January 6th, including violent rioters, <u>id.</u> at ECF 268.

In January 2024, Fischer filed this lawsuit, purportedly on behalf of himself and up to 10,000 others who were part of the crowd on the West Plaza of the U.S. Capitol on January 6th. The complaint names as defendants the District of Columbia, MPD, Mayor Bowser, former MPD Commander Glover, MPD Sergeant Thau, MPD Officer Crisman, and John Does MPD Officers 1–50 (collectively, "the District Defendants"); and the U.S. Capitol Police ("USCP"), the USCP Board, former USCP Deputy Chief Waldow, USCP Deputy Chief Loyd, former USCP Chief Steven Sund, former USCP Assistant Chief Yogananda Pittman, Speaker Emerita Nancy P. Pelosi, and John Does USCP Officers 1–50  (collectively, "the Federal Defendants"), and claims violations of Fischer's and putative class members' "First, Fourth, Fifth, Eighth, and Fourteenth Amendment" rights under 42 U.S.C. § 1983.  <u>See</u> ECF 1 ("Compl.") ¶¶ 2, 4.  Fischer sued all the officials in their official and individual capacities.  <u>See id.</u>; Am. Compl.  The complaint also asserted that Chief Sund, Assistant Chief Pittman, Speaker Emerita Pelosi, Mayor Bowser, Commander Glover, USCP, the USCP Board, MPD, and the District were "negligent" and suggested the officers on the scene may have violated the D.C. First Amendment Assemblies Act ("FAAA").  Compl. ¶¶ 30–33, 35–37.  The complaint seeks no specific relief.

The District Defendants and the Federal Defendants each moved to dismiss for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) and failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).  ECF 13 ("District MTD"), 20 ("Federal MTD").  After Fischer failed to file an opposition, the Court ordered him to show cause by

August 29, 2024, why the case should not be dismissed because he had not responded to the

motions.  Aug. 21, 2024, Minute Order.  Fischer then filed a motion for leave to file an amended

complaint, see ECF 22, and attached a proposed amended complaint, which added a "Claims"

section alleging five counts, see Am. Compl. ¶¶ 46–67.

 Count I alleges "[t]he conduct of each Defendant violated the rights of Plaintiffs to due

process and to not be subjected to the use of excessive force, as guaranteed by the Fourth and

Fifth Amendments to the United States Constitution, and entitles Plaintiffs to bring suit and

recover damages pursuant to 42 U.S.C. § 1983."  Id. ¶ 48.  Count II alleges "[t]he actions of the

Defendants . . . violated Plaintiffs' rights to due process and freedom of speech and association

guaranteed by the First and Fifth Amendments to the Constitution of the United States."  Id.

¶ 54.  Count III alleges "[t]he level of force and violence employed by Defendants shocks the

conscience and violates Plaintiffs' right to due process of law guaranteed by the Fifth and

Fourteenth Amendment[s] of the United States Constitution."  Id. ¶ 58.  Count IV alleges

"Defendants violated the Plaintiffs [sic] [Fifth and Fourteenth Amendment] civil rights through

their negligence, lack [of] good faith enforcement of their duties, and willful disregard for the

safety of peaceful election integrity demonstrators."  Id. ¶ 64; see also id. ¶¶ 62–63.  And Count

V alleges "Defendants violated Plaintiffs [sic] [Fifth and Fourteenth Amendment] civil rights by

conspiring to deprive said rights," "willfully expos[ing] these visitors to serious danger by not

having an appropriate and proportional security presence, by not restricting their agents' violent

attacks," and "by obfuscating the true genesis of the chaos on the Capitol's West Plaza,

selectively curating which evidence would be sequestered and which evidence would be released

to the media, the DOJ, and the Plaintiffs' [sic] and their attorneys."  Id. ¶ 67; see also id. ¶¶ 65–

66. The Amended Complaint seeks declaratory relief concerning the unconstitutionality of Defendants' actions and damages. Id. at Prayer for Relief.

The Defendants opposed Fischer's motion to amend his complaint as futile. ECF 23 ("Fed MTA Opp'n"); ECF 24 ("District MTA Opp'n"). Fischer then obtained counsel and filed a reply in support of his motion to amend, which effectively reads as an opposition to the Defendants' motions to dismiss. ECF 27 ("Reply"). He also filed a motion for an extension of time to file a request for class certification and a motion for class certification, see ECF 29, 30, which the Court stayed briefing on pending resolution of the motions to dismiss and motion to amend, see October 31, 2024, Minute Order.

## II.    Legal Standards

### A.    Motion to Dismiss

This court reviews motions to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). Poole v. Harvey, 571 F. Supp. 2d 120, 123 n.4 (D.D.C. 2008). "The plaintiff bears the burden of establishing that the court has jurisdiction, but the court must accept as true the non-movant's factual allegations." Id.

To survive a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), a complaint must contain sufficient factual matter, accepted as true, to state a plausible claim for relief. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). A claim is plausible if the pleaded facts allow the court to reasonably infer that the defendant is liable for the misconduct alleged. Iqbal, 556 at 678. While a court must take the complaint's factual allegations as true, it need not accept legal conclusions, and mere "labels" or "[t]hreadbare recitals of the elements of a cause of action . . . do not suffice." Id. (quoting Twombly, 550 U.S. at 555).

B.  Pro Se Parties

"[T]he pleadings of pro se parties are to be 'liberally construed' and 'held to less stringent standards than formal pleadings drafted by lawyers[.]'"  Tyson v. Brennan, 277 F. Supp. 3d 28, 35 (D.D.C. 2017) (alteration in original) (quoting Erickson v. Pardus, 551 U.S. 89, 94 (2007) (per curiam)).  A pro se litigant's complaint is assessed "in light of all filings, including filings responsive to a motion to dismiss," such as the opposition to the motion and attached exhibits.  Ho v. Garland, 106 F.4th 47, 50 (D.C. Cir. 2024) (quotation marks omitted) (quoting Brown v. Whole Foods Mkt. Grp., Inc., 789 F.3d 146, 152 (D.C. Cir. 2015) (per curiam)).  Here, Fischer was pro se when he filed his complaint and motion to amend, so the Court will liberally construe these filings.  Fischer obtained counsel before filing his reply in support of his motion to amend, so the Court will apply the customary pleading standard to that filing, which reads as an opposition to the Defendants' motions to dismiss.

C.  Amending a Complaint

Under Federal Rule of Civil Procedure 15, a plaintiff may amend his complaint once as a matter of course within 21 days of being served with a Rule 12(b) motion.  Fed. R. Civ. P. 15(a)(1)(B).  Beyond that, amendments require either the opposing party's written consent or court approval.  Fed. R. Civ. P. 15(a)(2).  While "[t]he [C]ourt should freely give leave [to amend] when justice so requires[,]" id., it may deny leave when amendment would be "futil[e]," Richardson v. United States, 193 F.3d 545, 548–49 (D.C. Cir. 1999) (citing Foman v. Davis, 371 U.S. 178, 182 (1962)).

## III.  Analysis

The Court will first consider Fischer's standing to bring this suit before turning to the merits of his claims.

A. <u>Standing</u>

A party seeking to invoke federal jurisdiction bears the burden of establishing the three elements of standing: (1) "injury in fact"; (2) "a causal connection between the injury and the conduct complained of"; and (3) "redressability."  <u>Lujan v. Defs. of Wildlife</u>, 504 U.S. 555, 560–62 (1992).  "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice."  <u>Id.</u> at 561.

      *1.  Injury in Fact*

Fischer alleges three injuries.  First, he says he was struck in the head by a pepperball round, which his complaint suggests was fired by a member of USCP.  Am. Compl. ¶ 24. Second, USCPB purportedly suppressed video evidence of January 6th, depriving him of the "ability to assert and prove . . . civil rights claims, as well as defend [himself] in criminal proceedings."  <u>Id.</u> ¶ 45.  Third, he claims that "[a]s a proximate result of the wrongful, malicious, and violent acts of Defendants," he and his purported class members "suffered . . . having their rights to engage in the constitutionally protected activities of political speech and assembly truncated, extinguished and/or deprived."  <u>Id.</u> ¶ 55.

Neither group of Defendants disputes that the first two described injuries can support standing.  <u>See</u> District MTD at 7 ("The only two discernible injuries Plaintiff alleges to have suffered are: (1) that he was hit by a pepperball fired by a USCP officer . . . and (2) that the Capitol Police Board suppressed evidence, denying him the "ability to assert and prove [his] civil rights claims, as well as defend [himself] in criminal proceedings." (second and third alterations in original) (citations omitted)); Federal MTD at 8–9 (describing "being struck with a non-lethal round" as "the sole injury [Fischer] appears to allege" but later challenging *redressability* of

9

alleged suppression injury). But they contest whether Fischer has plausibly pled an injury to his own First Amendment rights, rather than those of his purported class members generally.

The Court, however, deems Fischer's allegations sufficient to allege an Article III injury to his First Amendment rights. Fischer claims he was physically injured while participating in the protest, and he suggests the officers deployed this force "to obstruct and/or chill the protesters from making their statements and letting their objections to the counting of electoral college votes be heard." Reply at 8. He further asserts that the "violent" law enforcement response on January 6th "extinguished" the ability of the protesters to exercise their First Amendment rights. Am. Compl. ¶ 55. To frame his complaint as a class action, Fischer speaks broadly of "Plaintiffs." But he also speaks of *himself* in the third person. Id. ¶ 24. Accordingly, when Fischer's complaint is read as a whole, it plausibly pleads an injury to his own First Amendment rights.

### 2. Traceability

The District and Federal Defendants next contest whether Fischer's alleged injuries are traceable to any of their alleged conduct. Turning first to the Federal Defendants, they contend that Fischer has not alleged that a USCP officer fired the pepperball that struck him. See Federal MTD at 8. But Fischer alleges that "[a]t approximately 1:18pm, U.S. Capitol Police Deputy Chief Waldow gave the order for the U.S. Capitol Police Less Lethal team to fire . . . into the crowd," and "[t]he Less Lethal team fired at least 8 munitions at a group of entirely peaceful protesters standing near a large wooden cross." Am. Compl. ¶ 23. In the immediately following paragraph, he states that "[a]t 1:18pm, one pepperball round struck peaceful protester Plaintiff Alan E. Fischer III in his head, exploding against his left temple," which he describes as "an instance of deadly force." Id. ¶ 24. The natural interpretation of these two paragraphs is that

Fischer was hit by a round fired by USCP under the direction of Deputy Chief Waldow.  Given the generous pleading standard, Fischer need not have been explicit, as the Federal Defendants apparently would require.

The Federal Defendants also argue that Fischer's confrontation and assault of law enforcement rendered any injury he suffered "self-inflicted" and thus "sever[ed] the causal nexus needed to establish standing."  Federal MTD at 8 (quoting Ellis v. Comm'r, 67 F. Supp. 3d 325, 336 (D.D.C. 2014)).  But Fischer characterizes himself as a "peaceful protester."  Am. Compl. ¶ 24.  While the Federal Defendants point to the government's indictment of Fischer for his conduct on January 6th, see Federal MTD at 9, the fact of that indictment is insufficient to prove that Fischer caused his own injury.

Finally, the Federal Defendants contend that Fischer has not alleged how the acts of the specific federal officers curtailed his First Amendment rights.  Id. at 8.  But, again, Fischer's complaint pleads that he was struck by a round fired by USCP, and that this show of force was intended to discourage the exercise of his First Amendment rights.  That is enough to connect the Federal Defendants' alleged actions to his purported injury.

The District Defendants, meanwhile, argue that Fischer's allegation that he was shot by a USCP officer defeats traceability as to them.  See District MTD at 7.  But, as the District Defendants acknowledge, Fischer alleges that MPD Sergeant Thau "urged USCP Deputy Chief Eric Waldow and USCP Inspector Thomas Lloyd [sic] to fire into the crowd."  Id. at 8.  Therefore, he plausibly pled that Sergeant Thau's statement was at least part of the reason the USCP officers fired—and therefore, that his injury is traceable to an MPD officer's conduct.  See Garnett v. Zeilinger, 485 F. Supp. 3d 206, 219 (D.D.C. 2020) ("For purposes of Article III standing, 'it may be enough that the defendant's conduct is one among multiple causes.'"

(quoting <u>Orangeburg v. FERC</u>, 862 F.3d 1071, 1080 (D.C. Cir. 2017)).  True, higher-ranked USCP officers may not take orders from lower-ranked MPD officers as a matter of formal policy, <u>see</u> District MTD at 8, but it is still plausible that, here, Sergeant's Thau supposed encouragement caused the USCP officers to fire.[1]

### 3. Redressability

Finally, as to redressability, while Fischer's original complaint did not request specific relief, his amended complaint seeks a declaration that Defendants' acts were unconstitutional, as well as damages.  His request for damages is sufficient for redressability.  Cf. <u>Uzuegbunam v. Preczewski</u>, 592 U.S. 279, 292 (2021) ("[A] request for nominal damages satisfies the redressability element of standing where a plaintiff's claim is based on a completed violation of a legal right.").  To the extent any of the Defendants are immune from suit for damages, the Court will address that barrier to recovery below rather than in the context of redressability.

The Federal Defendants also construed Fischer's original complaint "to seek . . . injunctive relief regarding alleged evidence the 'Capitol Police Board intentionally suppressed.'" Federal MTD at 1 n.1.  Fischer, however, has not requested anything regarding such evidence in his later filings.  Accordingly, the Court deems the request forfeited.

* * *

In sum, Fischer has alleged the three elements of standing as required to invoke this Court's jurisdiction.  Therefore, the Court will turn to the merits of his claims.  Because different standards apply to suing local and federal officials, the Court will first consider Fischer's claims as to the District Defendants and then his claims as to the Federal Defendants.

---

[1] The District is correct, however, that Fischer has not pled that the District Defendants had anything to do with USCP's alleged suppression of evidence.  <u>See</u> District MTD at 7.  But Fischer appears to have abandoned any request for relief related to that injury.

B.  Constitutional Claims Against the District Defendants

Fischer has asserted various constitutional claims under 42 U.S.C. § 1983 against the District and MPD, as well as Mayor Bowser, Commander Glover, Sergeant Thau, Officer Crisman, and John Does MPD Officers 1–50, in their official and individual capacities.  The Court will begin by dismissing Fischer's claims against MPD, which cannot be sued in its own name.  See Heenan v. Leo, 525 F. Supp. 2d 110, 112 (D.D.C. 2007) ("Although plaintiff has named the MPD as a defendant, it is well settled that the MPD is non sui juris and, therefore, cannot sue or be sued.") (collecting cases).  As for the claims against the District officials, "official-capacity suits are treated as suits against the government entity itself."  Herrion v. Child.'s Hosp. Nat'l Med. Ctr., 786 F. Supp. 2d 359, 372 (D.D.C. 2011) (citing Hafer v. Melo, 502 U.S. 21, 25 (1991)).  Therefore, Fischer's claims against the District officials in their official capacities are akin to suits against D.C. and must satisfy the standard for pleading municipal liability.  The Court will first address whether Fischer has plausibly pled a theory of municipal liability before turning to his claims against the District officials in their individual capacities.

   1.  *Monell Liability*

Under 42 U.S.C. § 1983, any person acting under color of state law who deprives someone of federal rights can be sued for damages.  "A municipality is a 'person' subject to suit under 42 U.S.C. § 1983, although its liability is limited."  Brown v. District of Columbia, 514 F.3d 1279, 1283 (D.C. Cir. 2008) (quoting Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978)).  For example, "D.C. is not liable under § 1983 for injuries 'inflicted solely by its employees or agents.'"  Givens v. Bowser, 111 F.4th 117, 122 (D.C. Cir. 2024) (quoting Monell, 436 U.S. at 694).  "Rather, D.C. is liable only if a city policy or practice causes an injury."  Id.

To show that a D.C. policy or practice caused his alleged injury, Fischer must show "(1) an official policy explicitly adopted by D.C., (2) actions by a D.C. policymaker with final decision-making authority, (3) repeated behavior by D.C. municipal employees that ha[s] reached the level of a custom, or (4) a failure to act by D.C. that shows deliberate indifference to the potential for such violations." Id.

Fischer's claims against the District and District officials in their official capacities fail because he has not pled any such policy or practice by the District. Neither Fischer's original nor amended complaint identifies which theory of municipal liability, if any, he pursues. His reply in support of his motion to amend is the first time he advances any specific Monell theory, but it is still deficient. See Reply at 14–17.

Fischer's first argument is that he sued defendants "up and down the chain of command" who "[e]ach played their part" and "were not rogue offices [sic] acting outside of their directions nor protocol." Id. at 14. He says that, after January 6th, the District and the United States "ratified" the actions of the police on that day. Id. at 14–15. But, as the District notes, this allegation cannot support a theory of municipal liability. Municipal liability requires a showing of causation, see Givens, 111 F.4th at 22, which after-the-fact ratification cannot prove, see Cordova v. Aragon, 569 F.3d 1183, 1194 (10th Cir. 2009) ("[B]asic principals of linear time prevent us from seeing how conduct that occurs after the alleged violation could have somehow caused that violation.").

Fischer next opines that, on January 6th, "every one of the Metropolitan D.C. defendants, including the Mayor, were perfectly fine and fully approved of their police officers indiscriminately shooting munitions into a crowd and 'hurting innocent people.'" Reply at 16. To the extent he thereby attempts to allege "actions by a D.C. policymaker with final decision-

making authority," he has not sufficiently alleged a viable <u>Monell</u> liability claim.  Fischer has not

identified a specific final policymaker who made a "deliberate choice . . . among . . .

alternatives," as required by <u>Pembaur v. City of Cincinnati</u>, 475 U.S. 469, 483 (1986).  Instead,

his allegations describe a reactive response by multiple government agents to a chaotic situation,

which does not meet the "stringent" standard for municipal liability.  <u>Blue v. District of

Columbia</u>, 850 F. Supp. 2d 16, 26–27 (D.D.C. 2012); <u>compare</u> Am. Compl. ¶ 29 ("At 1:32pm,

Sgt Thau ordered Officer Crisman to stop throwing grenades into the crowd, saying 'it's just

going to make things worse', 'stop', 'hold fire.'"), <u>with id.</u> ¶ 30 ("Then, at 1:33pm, D.C.

Metropolitan Police Sgt Thau pulled out a 'hot burning smoke grenade' and threw it into the

crowd."), and <u>id.</u> ¶ 31 ("At 1:34pm, D.C. Metropolitan Police Sgt Thau pulled out a 'Triple

Chaser CS gas canister' to throw, and was then reprimanded by D.C. Metropolitan Police Officer

Tara Tindall that he 'just threw smoke: It was a burning munition, you give them three chances,

why would you?'" (quotation marks omitted)).   Without a clear assertion that a final

policymaker deliberately adopted the challenged conduct as official municipal policy, the claim

improperly attempts to impose liability based on the actions of individual MPD officers, which

<u>Monell</u> and its progeny prohibit.  <u>See</u> <u>Blue</u>, 850 F. Supp. 2d at 26–27.

     Perhaps acknowledging the shortcomings in his argument that the supposedly random

shooting of munitions into a peaceful crowd was a deliberate choice by a final policymaker,

Fischer alternately argues that "[t]he indiscriminate launching of munitions for a whole hour into

a crowd of innocent protesters is very likely to be a result of failure to train."  Reply at 17.  But

he has failed to establish municipal liability under a failure-to-train theory because he has not

shown the requisite "deliberate indifference."  <u>Bd. of Cnty. Comm'rs v. Brown</u>, 520 U.S. 397,

409 (1997).  Specifically, the Supreme Court has held that "[a] pattern of similar constitutional

violations by untrained employees is 'ordinarily necessary' to demonstrate" that policymakers were deliberately indifferent to a known deficiency in training. <u>Connick v. Thompson</u>, 563 U.S. 51, 62 (2011) (quoting <u>Bryan Cnty.</u>, 520 U.S. at 409)). Here, Fischer does not allege a pattern of prior constitutional violations sufficient to put decisionmakers on notice that the training program was inadequate. The only factual support provided is that Sergeant Thau and Officer Crisman allegedly "were recent defendants in civil litigation in D.C. court for the exact same conduct on more than one occasion, violating the FAAA with explosive munitions," and that Commander Glover was "a recent defendant" in another § 1983 case. Am. Compl. ¶ 42. But, without more context, such bareboned allegations do not establish that municipal policymakers knew or should have known about a systemic failure in training and consciously disregarded the risk. Fischer provides no details about those prior lawsuits or their outcomes, so they could have been meritless or unrelated to any systemic issue within the department.

Additionally, the circumstances surrounding the alleged violation here were so extraordinary that they do not fall within the "narrow range of circumstances" where a single violation may suffice for liability. <u>Bryan Cnty.</u>, 520 U.S. at 409. The Supreme Court has recognized that, absent a history of similar violations, municipal liability does not attach unless "a violation of federal rights may be a highly predictable consequence" of failing to train for "recurring situations." <u>Id.</u> But Fischer has not (and could not) allege that the circumstances of January 6th were so predictable as to mandate specific training. Therefore, without such an allegation or a pattern of prior violations, he has not plausibly alleged that District policymakers made the deliberate choice to implement an inadequate training program that would result in constitutional violations.

16

Accordingly, because Fischer has failed to plead any theory of <u>Monell</u> liability, the Court will dismiss his § 1983 claims against the District of Columbia and the District officials in their official capacities.

2. *Qualified Immunity*

Failure to plead <u>Monell</u> liability does not bar Fischer's individual-capacity claims against the District Defendants—namely, Commander Glover, Sergeant Thau, Officer Crisman, and Mayor Bowser. Instead, those claims must overcome qualified immunity, which protects officials from civil liability unless their actions "violate clearly established statutory or constitutional rights of which a reasonable person would have known." <u>Mullenix v. Luna</u>, 577 U.S. 7, 11 (2015) (quoting <u>Pearson v. Callahan</u>, 555 U.S. 223, 231 (2009)).

A right is clearly established when it is "sufficiently clear that every 'reasonable official'" would understand their conduct "violates that right." <u>Reichle v. Howards</u>, 566 U.S. 658, 664 (2012) (quoting <u>Ashcroft v. al–Kidd</u>, 563 U.S. 731, 741 (2011)). "In other words, existing law must have placed the constitutionality of the officer's conduct 'beyond debate.'" <u>District of Columbia v. Wesby</u>, 583 U.S. 48, 63 (2018) (quoting <u>al–Kidd</u>, 563 U.S. at 741). "This demanding standard protects 'all but the plainly incompetent or those who knowingly violate the law.'" <u>Id.</u> (quoting <u>Malley v. Briggs</u>, 475 U.S. 335, 341 (1986)).

"To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent" and must "clearly prohibit the officer's conduct in the particular circumstances before him." <u>Id.</u> The rule must be "so well defined" that a reasonable officer would understand his actions were unlawful in the specific situation. <u>Id.</u> Courts require a high "degree of specificity;" broad constitutional principles are not enough. <u>Id.</u> (quoting <u>Mullenix</u>, 577 U.S. at 12).

Additionally, qualified immunity generally requires "an *individualized* analysis of *each* officer's alleged conduct." Walton v. Dawson, 752 F.3d 1109, 1125 (8th Cir. 2014) (citation omitted); see also Poe v. Leonard, 282 F.3d 123, 134 (2d Cir. 2002); Cunningham v. Gates, 229 F.3d 1271, 1289 (9th Cir. 2000). Therefore, the Court must evaluate the MPD officials independently from the USCP officials, rather than treating them as a single collective.

a. First Amendment

In his Amended Complaint, Fischer alleges that "Defendants acted to eliminate any possibility of Plaintiffs' exercise of their rights to speech, movement and association by the unnecessary and violent acts." Am. Compl. ¶ 54. The Court construes this as an attempted First Amendment abridgement claim against the MPD officers. In his reply, Fischer also advances a retaliation claim, alleging that the "intent of the police" was "to obstruct and/or chill the protesters from making their statements and letting their objections to the counting of electoral college votes be heard." Reply at 8.

Although the District Defendants urge the Court to disregard this retaliation theory because plaintiffs generally cannot amend complaints through briefs, see ECF 28 ("District Surreply") at 3, the Court will consider it given Fischer's pro se status when he filed his complaint and proposed amended complaint. While Fischer's retention of counsel before filing the reply affects the standard of review for the reply, it does not require the Court to strictly apply forfeiture to filings made when Fischer was pro se. See Tyson, 277 F. Supp. 3d at 35.

Courts assessing a First Amendment abridgement claim must determine: (1) whether the plaintiff was engaged in protected speech and (2) the nature of the forum where the speech occurred. See Boardley v. U.S. Dep't of Interior, 615 F.3d 508, 514 (D.C. Cir. 2010). Depending on the forum, the Court then evaluates whether the government's justifications for

restricting speech satisfy the required legal standard.  Id.  "In a public forum, the [g]overnment can impose reasonable time, place, and manner regulations" if they are "content-neutral, narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication."  Mahoney v. U.S. Marshals Serv., 454 F. Supp. 2d 21, 32 (D.D.C. 2006).

"[C]ourts have long recognized that the Capitol Grounds as a whole meet the definition of a traditional public forum."  Lederman v. United States, 291 F.3d 36, 41 (D.C. Cir. 2002); see also id. at 44 (holding the East Front sidewalk is a public forum); Jeannette Rankin Brigade v. Chief of Capitol Police, 342 F. Supp. 575, 583–84 (D.D.C. 1972) (holding the Capitol Grounds are not an area to which access cannot be denied broadly or absolutely).

Fischer has pled that he was engaged in protected activity (political speech) in a public forum (the Capitol Grounds).  But he has not pled the MPD officers' response was content-based.  His assertion that their "intent" was "to obstruct and/or chill" protesters from expressing their objections to the counting of electoral votes does not establish that the police "interfere[d] with the demonstration[] because of the content of the message [it] sought to present."  Wash. Mobilization Comm. v. Cullinane, 566 F.2d 107, 119 (D.C. Cir. 1977).  There is no indication the MPD officers selectively "hindered" First Amendment rights "by only certain groups or only when certain ideas were expressed."  Id. at 119–20.  Rather, their obvious concern was with the protesters' conduct rather than their speech.  See id.

Fischer's own filings concede that, by the time the MPD officers arrived, protesters were "agitated" and had begun "pushing against U.S. Capitol Police officers on the police line."  Am. Compl. ¶ 17.  And MPD officers began "engaging with protesters with physical violence."  Id. ¶ 20.  Even accepting Fischer's claim that USCP initiated force and that the crowd had been

peaceful beforehand, he acknowledges that by the time the MPD officers arrived, the scene had

changed.  Law enforcement is permitted to "contain or disperse" a demonstration once it

becomes "violent" and "obstructive" without violating the First Amendment.  Wash.

Mobilization Comm., 566 F.2d at 119.  Because Fischer admits that the protest against the

certification of the election had turned violent, the MPD officers' intervention was clearly

justified to restore order.

The permissibility of the MPD officers' actions is bolstered by the fact that "the

protection of prominent government figures has been found to be a significant interest,"

particularly in high-profile and potentially volatile settings.  Mahoney, 454 F. Supp. 2d at 33

(citing United States v. Grace, 461 U.S. 171, 182 (1983)).  Given that, as Fischer acknowledges,

members of Congress were actively engaged in certifying election results and that government

officials were present in a confined area within the U.S. Capitol, see Am. Compl. ¶ 10, the risk of

"violence or . . . disruption" was both foreseeable and substantial.  Mahoney, 454 F. Supp. 2d at

33.  "Common sense dictates" that such circumstances create a heightened security concern,

warranting immediate and decisive action by law enforcement to safeguard officials and

maintain public order.  Id.  Therefore, under established precedent, the MPD officers' actions to

contain or disperse the protest were patently justified by the government's compelling interest in

ensuring the safety of its officials during a constitutionally mandated proceeding.

Fischer's eleventh-hour retaliation claim fails for similar reasons.  Plaintiffs asserting a

claim for First Amendment retaliation "must allege that they engaged in protected conduct, that

the government took retaliatory action capable of deterring another from the same protected

activity, and that there is a causal link between the two."  Comm. on Ways & Means v. U.S.

Dep't of Treasury, 45 F.4th 324, 340 (D.C. Cir. 2022) (citing Scahill v. District of Columbia, 909

F.3d 1177, 1185 (D.C. Cir. 2018)).  "The improper motive must be a but-for cause of the

government action, 'meaning that the adverse action against the plaintiff would not have been

taken absent the retaliatory motive.'"  Id. (quoting Nieves v. Bartlett, 587 U.S. 391, 399 (2019)).

By alleging that the District Defendants intended "to obstruct and/or chill the protesters"

from speaking against the certification of the election by using pepper balls, flash grenades, and

other munitions, Reply at 8, Fischer has pleaded protected activity (political speech) and a

government action capable of deterrence (use of force).  But Fischer has not plausibly alleged

improper motive.  While he claims the District Defendants sought to disperse a crowd that had

the right to assemble, he ignores the "obvious alternative explanation" for their actions:  Officers

were responding to escalating violence against law enforcement and potential violence against

members of Congress and attempting to prevent further encroachment into the Capitol.  Iqbal,

556 U.S. at 682.  Given this lawful alternative justification, Fischer has not plausibly alleged that

retaliation was the but-for cause of the MPD officers' actions.

Accordingly, Fischer has failed to plausibly allege First Amendment retaliation or

abridgement claims.  But, even if the complaint could be read to assert such claims, Fischer has

not shown that the officers' conduct violated clearly established law.  Because the events of

January 6th were "unprecedented," Trump v. Thompson, 20 F.4th 10, 33 (D.C. Cir. 2021), no

legal principle "clearly prohibit[ed]" the MPD officers' "conduct in the particular circumstances

before" them.  Wesby, 583 U.S. at 63.  Without a prior case placing the MPD officers' conduct

"beyond debate," they are entitled to qualified immunity on Fischer's First Amendment claims

against them, which the Court will accordingly dismiss.  Id. (quoting al–Kidd, 563 U.S. at 741).

As for Mayor Bowser, Fischer's only allegation is that she was "negligent and showed

reckless disregard in her authority over D.C. and the Capitol's security by making an informed

decision to deny the presence of National Guard troops to maintain order[] after repeated authorization by President Donald Trump."  Am. Compl. ¶ 39.  But negligence does not rise to a First Amendment violation, nor does Fischer allege that Mayor Bowser personally acted to curtail his rights or retaliate against him for his speech.  Indeed, as the District Defendants note, "the Amended Complaint 'lacks any factual allegations as to Mayor [Bowser's] personal involvement in [any use of force]' . . . occurring at the U.S. Capitol on January 6."  District MTA Opp'n at 22 (first and second alterations in original).  Since § 1983 liability requires personal involvement, the Mayor cannot be held liable for alleged constitutional violations committed by the police officers.  See Jordan v. District of Columbia, 113 F. Supp. 3d 278, 282 n.2 (D.D.C. 2015) ("The Mayor simply cannot be held liable for alleged constitutional violations committed by the police officers who allegedly shot plaintiff.").  Accordingly, Fischer's § 1983 claims against her must also be dismissed.

### b.  Fourth Amendment

Next, Fischer alleges a Fourth Amendment violation because the officers' "[i]ndiscriminate[] shooting" of "munitions into a crowd" was an unreasonable use of force. Reply at 9.  A Fourth Amendment seizure "requires the use of force with intent to restrain." Torres v. Madrid, 592 U.S. 306, 317 (2021).  "[F]orce intentionally applied for some other purpose" will not qualify.  Id.; see also Gomez v. Turner, 672 F.2d 134, 139 (D.C. Cir. 1982) ("The fourth amendment is not implicated, however, unless there is a 'seizure' and the seizure is unreasonable."); Harris v. Bowser, 369 F. Supp. 3d 93, 100 (D.D.C. 2019) ("A Section 1983 Fourth Amendment claim begins with a determination that a seizure occurred and then looks at whether the force used was unreasonable.").

Here, however, Fischer is explicit that the MPD officers deployed force "with no intent to arrest." Am. Compl. ¶ 21. Instead, he contends, "the intent of the police was certainly to disburse [sic] the crowd." This concession is fatal to Fischer's Fourth Amendment claim: The MPD officers' use of force for this "other purpose" of dispersing the crowd does not qualify as a seizure.

Because Fischer has not alleged a Fourth Amendment seizure, his claim cannot proceed. Again, however, even if the complaint could be construed to state such a claim, given the "unprecedented" circumstances surrounding the violent encroachment of the U.S. Capitol, Fischer has not demonstrated that "every 'reasonable official'" would have understood the MPD officers' conduct to violate the Fourth Amendment. Reichle, 566 U.S. at 664 (quoting al–Kidd, 563 U.S. at 741). Accordingly, they are entitled to qualified immunity on this claim.

The Court will also dismiss Fischer's Fourth Amendment claims against Mayor Bowser in her individual capacity for the same reason it dismissed his First Amendment claim against her: He has nowhere alleged that she participated in the allegedly unreasonable force used by the MPD officers at the Capitol.

### c. Fifth Amendment

In his reply, Fischer appears to allege violations of the substantive due process clause of the Fifth Amendment[2] based on the MPD officers' alleged "use of indiscriminate force against a crowd without justification," the D.C. First Amendment Assemblies Act ("FAAA"), and failure to warn the crowd before using munitions. Reply at 10–11.

---

[2] The Fifth, not the Fourteenth, Amendment applies to the District. See Bolling v. Sharpe, 347 U.S. 497, 499 (1954).

The D.C. Circuit applies "sensible guidelines" to evaluate a due process claim based on the use of force, considering "the need for the application of force, the relationship between the need and the amount of force that was used, the extent of injury inflicted, and whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." Norris v. District of Columbia, 737 F.2d 1148, 1150 (D.C. Cir. 1984) (citation omitted).  Fischer has pointed to no authority establishing that force applied in similar circumstances and comparable to that applied by the MPD officers here was found to violate a Fifth Amendment substantive due process right.  Therefore, he cannot claim that existing law "clearly prohibit[ed]" the officers' "conduct in the particular circumstances before" them.  Wesby, 583 U.S. at 63.

Turning next to the alleged violation of the FAAA, the statute provides that upon determination that a First Amendment assembly should be dispersed and there is "imminent danger of bodily injury or significant damage to property," the MPD shall "issue at least one clearly audible and understandable order to disperse using an amplification system or device" and "provide the participants a reasonable and adequate time to disperse and a clear and safe route for dispersal."  D.C. Code § 5-331.07(e).  It applies on the "streets, sidewalks, and other public ways, and in the parks of the District of Columbia."  D.C. Code §§ 5-331.03; 5-331.07. At least one other court in this district has concluded that the U.S. Capitol grounds are "federal property secured by the USCP" and thus not the "streets, sidewalks, and other public ways, and in the parks of the District of Columbia."  Christmann v. District of Columbia, No. 22-cv-2189 (BAH), 2024 WL 216726, at *9 (D.D.C. Jan. 20, 2024).  Even if the Capitol grounds were treated as D.C. streets, however, and even if the MPD officers failed to give warnings as Fischer alleges, that does not necessarily establish a Fifth Amendment violation.  Am. Fed'n of Gov't

Emps. v. Nicholson, 475 F.3d 341, 353 (D.C. Cir. 2007) ("[A] mere violation of law does not give rise to a due process claim."). Nor can Fischer ground his alleged Fifth Amendment claim in any failure to warn. Ferris v. District of Columbia, No. 23-cv-481 (RCL), 2023 WL 8697854, at *12 (D.D.C. Dec. 15, 2023) ("[D]ue process does not require police to provide fair warning whenever they use force. And even if such a right does exist, it certainly was not clearly established at the time of the events in question.").

Fischer's Fifth Amendment theories rely on broad constitutional principles that flunk the requisite "degree of specificity" required to overcome qualified immunity. Wesby, 583 U.S. at 63 (quoting Mullenix, 577 U.S. at 12). Accordingly, the Court will dismiss his Fifth Amendment claims against the MPD officers. It will also dismiss his Fifth Amendment claims against Mayor Bowser, for the reasons previously discussed.

In sum, the Court will dismiss Fischer's § 1983 claims against MPD because it is non sui juris; against the District itself and against the District officials in their official capacities because Fischer failed to plead a theory of Monell liability; and against the District officials in their individual capacities because Fischer failed to plead constitutional violations, and the officials are entitled to qualified immunity. Thus, no constitutional claims against the District Defendants remain.

C. Constitutional Claims Against the Federal Defendants

Fischer next tries his luck with § 1983 and Bivens claims alleging the same constitutional violations against USCP and the USCP Board, as well as Deputy Chief Waldow, Deputy Chief Loyd, Chief Steven Sund, Assistant Chief Yogananda Pittman, and Speaker Emerita Nancy P. Pelosi in their official and individual capacities.

1. *§ 1983*

The Federal Defendants' first response is that, because § 1983 does not apply to federal officials acting under color of federal law, the United States has not waived its immunity with respect to claims under § 1983. See Federal MTD at 5–6.

"[T]he United States may not be sued without its consent and . . . the existence of consent is a prerequisite for jurisdiction." Settles v. U.S. Parole Comm'n, 429 F.3d 1098, 1105 (D.C. Cir. 2005) (quoting United States v. Mitchell, 463 U.S. 206, 212 (1983)). Section 1983 does not "expressly waive . . . the federal government's sovereign immunity." Nicholas v. U.S. Secret Serv., No. 18-cv-0606 (EGS), 2020 WL 2571520, at *1 (D.D.C. May 21, 2020). Accordingly, "[i]f the United States has not consented to being sued under § 1983, sovereign immunity requires the court to dismiss" the "claim for lack of jurisdiction." Id. On this basis, the Court will dismiss Fischer's claims against the Federal Defendants in their official capacities, which are suits against the United States itself, see Herrion, 786 F. Supp. 2d at 372, and his claims against USCP and the USCP Board, which are federal agencies and thus "shielded from suit by the United States'[s] sovereign immunity," Baugh v. U.S. Capitol Police, No. 22-cv-139 (TJK), 2022 WL 2702325, at *4 (D.D.C. July 12, 2022) (citation omitted). But the United States's sovereign immunity does not apply to the federal officers sued in their *individual* capacities under § 1983. For those Federal Defendants, the question instead is whether Fischer may assert a cause of action against them under § 1983.

As noted, 1983 applies to conduct done under color of state law. Therefore, a defendant sued under § 1983 must have been exercising the authority of the state. "Courts generally treat under color of law . . . as the same thing as the state action required under the Fourteenth Amendment." Williams v. United States, 396 F.3d 412, 414 (D.C. Cir. 2005) (alteration in

original) (quotation marks omitted) (quoting <u>Rendell–Baker v. Kohn</u>, 457 U.S. 830, 838 (1982)). Because federal officials act under federal law, they generally fall outside § 1983's reach. <u>Jones v. Delaney</u>, 610 F. Supp. 2d 46, 49 (D.D.C. 2009) ("Section 1983 does not apply to federal officials acting under color of federal law." (alteration omitted) (quoting <u>Settles</u>, 429 F.3d at 1104)). Individuals suing federal officers for constitutional violations usually must instead proceed through a <u>Bivens</u> action. However, as Fischer contends, when federal officers act together or conspire with state officials to deprive an individual of his constitutional rights, they may be considered to have acted under color of state law for § 1983 purposes. <u>See</u> <u>Williams</u>, 396 F.3d at 414–15; <u>Lewis v. Bayh</u>, 577 F. Supp. 2d 47, 57 n.5 (D.D.C. 2008) ("Although the defendant is a federal official and § 1983 ostensibly applies to state officials, even federal officials may be liable under § 1983 provided they acted in concert with state officials.").

This principle derives from a series of Supreme Court cases recognizing that state action may be found where "there is such a 'close nexus between the State and the challenged action' that seemingly *private* behavior 'may be fairly treated as that of the State itself.'" <u>Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n</u>, 531 U.S. 288, 295 (2001) (emphasis added) (citation omitted). "[A] challenged activity may be state action when it results from the State's exercise of 'coercive power,' when the State provides 'significant encouragement, either overt or covert,' or when a private actor operates as a 'willful participant in joint activity with the State or its agents.'" <u>Id.</u> at 296 (citations omitted).

The exact standard for determining when a federal official, as opposed to a private party, acts under color of state law is somewhat unclear. Courts have recognized "[a] plaintiff may well need to allege a higher level of coordination to show federal officers, rather than private parties, acted under color of state law." <u>Big Cats of Serenity Springs, Inc. v. Rhodes</u>, 843 F.3d

853, 870 n.8 (10th Cir. 2016); see also Hernandez v. Causey, 124 F.4th 325, 337 (5th Cir. 2024)

(requiring "evidence of a conspiracy between the federal actor and a state actor to deprive the

plaintiff of his rights under color of *state* law" (emphasis in original)); Strickland ex rel.

Strickland v. Shalala, 123 F.3d 863, 867 (6th Cir. 1997) ("[C]ourts finding that a *federal* official

has acted under color of state law have done so only when there is evidence that federal and state

officials engaged in a conspiracy or 'symbiotic' venture to violate a person's rights under the

Constitution or federal law." (emphasis in original)); Arar v. Ashcroft, 585 F.3d 559, 568 (2d

Cir. 2009) (en banc) ("[S]ince 'federal officials typically act under color of federal law,' they are

rarely deemed to have acted under color of state law." (citation omitted)); Cabrera v. Martin, 973

F.2d 735, 743 (9th Cir. 1992) ("We have not found a single precedent which would support a

holding that a federal agency acting under its own guidelines could be considered to have acted

'under color of state law' merely because it was induced by the actions of a state actor."). In Big

Cats, the Tenth Circuit explained that a higher burden may be warranted because a plaintiff

attempting to assert such a theory "must overcome the presumption[s] that [1] Congress did not

intend for federal officers to be subject to § 1983 litigation" and "that [2] where federal and state

actors come together, they are acting pursuant to supreme law." 843 F.3d at 870 n.8 (citations

omitted).

     Without articulating an exact standard for determining whether the federal actor's

conduct can "be fairly treated as that of" the state, the D.C. Circuit has considered whether the

state "gave him the power" to act, "exercised . . . coercive power" through him, or otherwise

"provid[ed] significant encouragement." Williams, 396 F.3d at 415 (citations omitted).

     Fischer's allegations do not meet these requirements. He asserts only that "the two police

departments worked together, collaborated and conspired in the use of force and the

indiscriminate launching of munitions into the crowd of protesters," including by "shar[ing] munitions and g[iving] each other directions on where to point their weapons for launching the munitions."  Reply at 12.[3]  He has not claimed that the District gave the USCP officers the power to act or exercised coercive power over them.  And while he references a "conspiracy," Reply at 12, he has not specifically pled that the Federal and District Defendants had the requisite "meeting of the minds" to violate his rights.  Graves v. United States, 961 F. Supp. 314, 320 (D.D.C. 1997) (holding that "an essential element of a conspiracy claim" is an agreement or "meeting of the minds").  Indeed, "[r]ather than alleging any actual agreement at a particular time," Fischer points only to "facts which are 'merely consistent with' a conspiracy."  White v. United States, 791 F. Supp. 2d 156, 162 (D.D.C. 2011) (quoting Twombly, 550 U.S. at 557).  But these facts "'could just as well be' the result of 'independent action,' absent any agreement between defendants."  Id. (quoting Twombly, 550 U.S. at 557); see also Steshenko v. Gayrard, 70 F. Supp. 3d 979, 998 (N.D. Cal. 2014) ("A mere allegation of conspiracy is insufficient to state a claim." (citing Holgate v. Baldwin, 425 F.3d 671, 676–77 (9th Cir. 2005)).  For example, according to Fischer, the USCP officers had fired into the crowd before the MPD officers even arrived.  Compare Am. Compl. ¶ 16 with id. ¶ 20.  Moreover, as noted, Fischer's complaint describes a reactive response to a chaotic situation as opposed to a coordinated "meeting of the minds."

Accordingly, because Fischer had not pled that the USCP officers at the scene conspired with the MPD officers so that the USCP officers were acting under color of District law, he cannot assert a § 1983 claim against them.

---

[3] Fischer does not allege any facts capable of establishing that Chief Sund, Assistant Chief Pittman, or Speaker Emerita Nancy P. Pelosi, who were not at the West Plaza during the events in question, were in any way involved in a conspiracy with the District Defendants.

    *2.  Bivens*

Fischer next tries to traverse a better worn road for suing federal officials: a <u>Bivens</u> suit, "the federal counterpart of a claim brought pursuant to 42 U.S.C. § 1983." <u>Ali v. Rumsfeld</u>, 649 F.3d 762, 767 n.3 (D.C. Cir. 2011) (citation omitted).  But this route is also blocked, for recognizing new causes of action under <u>Bivens</u> is a "disfavored judicial activity." <u>Egbert v. Boule</u>, 596 U.S. 482, 491 (2022) (quoting <u>Ziglar v. Abbasi</u>, 582 U.S. 120, 135 (2017)).

In <u>Bivens v. Six Unknown Federal Narcotics Agents</u>, 403 U.S. 388 (1971), the Supreme Court recognized an action for damages against federal officials for an alleged Fourth Amendment violation when they "allegedly manacled the plaintiff and threatened his family while arresting him for narcotics violations." <u>Egbert</u>, 596 U.S. at 490.  Within the next ten years, the Court twice extended <u>Bivens</u>: "first, for a former congressional staffer's Fifth Amendment sex-discrimination claim" and "second, for a federal prisoner's inadequate-care claim under the Eighth Amendment." <u>Id.</u> at 490–91 (first citing <u>Davis v. Passman</u>, 442 U.S. 228 (1979); and then citing <u>Carlson v. Green</u>, 446 U.S. 14 (1980)).  Since then, however, the Court has "declined 11 times to imply a similar cause of action for other alleged constitutional violations." <u>Id.</u> at 486. The Court has "made clear that, in all but the most unusual circumstances, prescribing a cause of action is a job for Congress, not the courts." <u>Id.</u>

When analyzing a proposed <u>Bivens</u> claim, courts have traditionally asked two questions: First, does "the case present[] 'a new *Bivens* context'—*i.e.*, is it 'meaningful[ly]' different from the three cases in which the Court has implied a damages action." <u>Id.</u> at 492 (second alteration in original) (quoting <u>Ziglar</u>, 582 U.S. at 139).  Second, are there "'special factors' indicating that the Judiciary is at least arguably less equipped than Congress to 'weigh the costs and benefits of allowing a damages action to proceed'"? <u>Id.</u> (quoting <u>Ziglar</u>, 582 U.S. at 136).  In <u>Egbert</u>, the

Supreme Court clarified that these two questions boil down to one issue: "whether there is any reason to think that Congress might be better equipped to create a damages remedy."  Id.  If yes, the Court may not recognize a Bivens remedy.  Id.  So, in Egbert, for example, the Court declined to recognize a Bivens remedy even though the plaintiff was, like Mr. Bivens, "an American citizen who argue[d] that a federal law enforcement officer violated the Fourth Amendment in searching the curtilage of his home."  Id. at 503 (Gorsuch, J., concurring).

As explained below, the Court will not recognize a Bivens remedy for Fischer's alleged First, Fourth, and Fifth Amendment violations.

### a. First Amendment

The Supreme Court has "never held that *Bivens* extends to First Amendment claims."  Id. at 498 (quoting Reichle, 566 U.S. at 663, n.4).  In Egbert, it explicitly concluded "that there is no *Bivens* action for First Amendment retaliation."  Id. at 499.  It therefore follows that there is also no Bivens action for First Amendment abridgement.  Any alleged First Amendment violations that occurred during the events at the U.S. Capitol on January 6th present a new context from existing Bivens scenarios: "an allegedly unconstitutional arrest and search carried out in New York City," "alleged sex discrimination on Capitol Hill," and the "alleged failure to provide adequate medical treatment" at a federal correctional facility in Indiana.  Hernandez v. Mesa, 589 U.S. 93, 99, 103 (2020) (describing the facts of Bivens, Davis, and Carlson); see also Oliva v. Nivar, 973 F.3d 438, 442 (5th Cir. 2020) ("Virtually everything else" other than the specific circumstances of Bivens, Davis, and Carlson, "is a 'new context.'" (quoting Ziglar, 582 U.S. at 135)).  And the special factors that led the Court not to extend Bivens to First Amendment retaliation in Egbert apply with equal force to First Amendment abridgement.  Specifically, the Court reasoned that "[e]xtending *Bivens* to alleged First Amendment violations would pose an

acute risk of increasing" social costs, "including the risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties."  596 U.S. at 499 (quoting Anderson v. Creighton, 483 U.S. 635, 638 (1987)).  Therefore, the Court will not recognize a Bivens remedy for Fischer's First Amendment claims.

### b.  Fourth Amendment

Fischer's assertion that Bivens applies to his Fourth Amendment claims because "federal officers used excessive force while denying the plaintiffs' their constitutional rights" is unpersuasive.  Reply at 18.  If that were enough to justify extending Bivens, then the Court would have done so in Egbert.  Indeed, the circumstances of this case are less like Bivens than Egbert or other cases where courts have declined to recognize a Bivens remedy.  See, e.g., Robinson v. Pilgram, No. 20-cv-2965 (GMH), 2021 WL 5987016, at *12 (D.D.C. Dec. 17, 2021) (distinguishing Bivens because "Plaintiff's harm stems from an arrest outside the home based on Plaintiff's possession of illegal weapons," whereas the alleged use of force in Bivens took place in the home for alleged narcotics violations).  This case is closer to Black Lives Matter D.C. v. Trump, 544 F. Supp. 3d 15 (D.D.C. 2021), where a fellow court in this district concluded that claims "concern[ing] government officers' response to a large protest in Lafayette Square outside the White House" were "markedly different from entering and searching a private apartment to enforce federal narcotics laws."  Id. at 31.

The involvement of "new category of defendants" further distinguishes this Fourth Amendment claim from that in Bivens.  Hernandez, 589 U.S. at 102 (quoting Correctional Servs. Corp. v. Malesko, 534 U.S. 61, 68 (2001)).  USCP officers are a "new category of defendants"

from the narcotics agents in <u>Bivens</u>, the congressman in <u>Davis</u>, and the prison officials in <u>Carlson</u>.[4]

And special factors indicate the judiciary is less equipped than Congress to recognize a remedy for Fischer's alleged Fourth Amendment violation here.  "If there are alternative remedial structures in place, 'that *alone*[]' . . . is reason enough to 'limit the power of the Judiciary to infer a new *Bivens* cause of action.'"  <u>Egbert</u>, 596 U.S. at 493 (emphasis added) (quoting <u>Ziglar</u>, 582 U.S. at 137).  "The question is whether alternative remedies exist, not whether they cover the full breadth of harm that a would-be *Bivens* plaintiff alleges."  <u>Liff v. Off. of Inspector Gen. for U.S. Dep't of Lab.</u>, 881 F.3d 912, 921 (D.C. Cir. 2018).

The Supreme Court has recognized that an internal grievance and disciplinary process is an alternative remedy adequate to preclude recognizing a new <u>Bivens</u> action.  <u>See</u> <u>Malesko</u>, 534 U.S. at 74 (federal prisoners' ability to file grievances through Bureau of Prison's Administrative Remedy Program); <u>Egbert</u>, 596 U.S. at 497–98 (Border Patrol's grievance process).  Such alternative remedies against the Federal Defendants are present here.  Congress has established an Office of the Inspector General within USCP that is authorized to investigate alleged violations or abuses of authority by USCP.  <u>See</u> 2 U.S.C. § 1909(3).  And individuals may file complaints against USCP officers, <u>see</u> Complaints, United States Capitol Police, https://www.uscp.gov/contact/complaint-report (last visited Mar. 24, 2025), which are reviewed, investigated, summarized in a report, and sometimes result in discipline, United States Capitol Police, Complaint Process and Procedure, https://www.uscp.gov/sites/evo-subsites/www.uscp.gov/files/wysiwyg_uploaded/USCP%20Complaint%20Process%20and%20P

---

[4] Fischer asserts that Speaker Emerita Pelosi is not a "new" defendant because she, like the defendant in <u>Davis</u>, is a congressperson.  Reply at 19.  But <u>Davis</u> was a Fifth Amendment case, and Fischer does not implicate Pelosi in any use of force.

rocedures%20Pamphlet%202021.pdf (last visited Mar. 24, 2025).  This process is like the CBP's internal grievance procedure, which the Supreme Court deemed adequate in <u>Egbert.</u>  596 U.S. at 498–99.  Likewise, Speaker Emerita Pelosi is subject to a grievance procedure through the Office of Congressional Ethics, which reviews allegations of misconduct against members of the United States House of Representatives and can also receive complaints.  <u>See</u> Make a Submission, Office of Congressional Ethics, https://oce.house.gov/contact-us/make-a-submission (last visited Mar. 24, 2025).

The Federal Torts Claim Act ("FTCA") may also be an alternative avenue for relief. Granted, in <u>Carlson</u>, the Supreme Court determined that the FTCA did not displace a <u>Bivens</u> action.  <u>See</u> 446 U.S. at 20.  But, given the evolution in the Supreme Court's approach to <u>Bivens</u> since then, courts have subsequently concluded that potential FTCA relief was a special factor counseling against extension of <u>Bivens</u>.  <u>See, e.g.,</u> <u>Edwards v. Gizzi</u>, No. 20-cv-7371, 2022 WL 309393, at *9 (S.D.N.Y. Feb. 2, 2022) (collecting cases).

Accordingly, the presence of alternative remedial structures here is "'alone' . . . reason enough" to refrain from extending <u>Bivens</u> in this area.  <u>Egbert</u>, 596 U.S. at 493 (quoting <u>Ziglar</u>, 582 U.S. at 137).

### c. <u>Fifth Amendment</u>

The Supreme Court has never recognized a <u>Bivens</u> remedy for a Fifth Amendment violation based on the use of force, the violation of a statute, or the failure to warn.  Therefore, Fischer's Fifth Amendment claim presents a new context.  And, for the reasons discussed above, the Court concludes the same special factors discussed in its First and Fourth Amendment analyses (social costs and the presence of an alternative remedial structure) caution against recognizing a <u>Bivens</u> remedy for Fischer's Fifth Amendment claim.

* * *

Accordingly, because Fischer has not alleged a conspiracy between federal and state officers that renders the federal officers' conduct state action for purposes of § 1983, and because the Court will not recognize a <u>Bivens</u> remedy against the officers, the Court will dismiss Fischer's individual-capacity claims against them.  And, as noted, his official-capacity suits against them, USCP, and the USCP Board are barred by sovereign immunity.

### D.  Any Remaining Claims

In his original complaint, Fischer appeared to allege common-law tort claims for negligence and assault, an Eighth Amendment claim, and a direct violation of the FAAA.  <u>See</u> Compl. ¶¶ 4, 30–33, 35–37.  But his amended complaint specifically added a "Claims" section that omitted any mention of these claims, <u>see</u> Am. Compl. ¶¶ 46–67, even though both the District Defendants and Federal Defendants had addressed them in their motions to dismiss, <u>see</u> District MTD at 23, 25–31; Federal MTD at 6–7.  Similarly, his reply in support of his motion to amend abandoned any such claims and referenced the FAAA only as a hook for his due process claim, discussed above.  Given that Fischer was counseled when he filed his reply, this Court determines he has forfeited any tort and freestanding FAAA claims.  <u>See Wal-Mart Stores, Inc. v. Sec'y of Lab.</u>, 406 F.3d 731, 736 (D.C. Cir. 2005) (noting that party had, "by its silence in reply" brief, "abandoned" an argument raised in its opening brief).[5]

---

[5] In any event, these claims likely would have failed anyway—any tort claims against the District because Fischer failed to comply with the notice requirement of D.C. Code § 12-309, <u>see</u> ECF 13-2 (Declaration of Lana Craven); <u>Martin v. District of Columbia</u>, 720 F. Supp. 2d 19, 25 n.6 (D.D.C. 2010) (considering police reports in evaluating § 12-309 compliance without converting motion to dismiss to motion for summary judgment); any tort claims against Mayor Bowser because they would be barred by absolute immunity, <u>see Holman v. Williams</u>, 436 F. Supp. 2d 68, 80 (D.D.C. 2006); any assault (or battery) claims against the District officers because they would be time-barred by the one-year statute of limitations, <u>see</u> D.C. Code § 12-301(a)(4), or otherwise dismissed based on qualified privilege, <u>see Wallace v. District of</u>

E.  Motion to Amend

Because Fischer's amended complaint would not survive a motion to dismiss, the Court

will deny his motion to amend.  See Richardson, 193 F.3d at 548–49 (citing Foman, 371 U.S. at

182).

IV.  Conclusion

For the foregoing reasons, the Court will grant the District Defendants' Motion to

Dismiss and the Federal Defendants' Motion to Dismiss, deny Plaintiff's Motion for Leave to

File Amended Complaint *Nunc Pro Tunc*, and deny as moot Plaintiff's Motion for Extension of

Time to Request Class Certification and Plaintiff's Motion for Class Certification.  A separate

order shall accompany this memorandum opinion.

_____
CHRISTOPHER R. COOPER
United States District Judge

Date:  March 24, 2025

---

Columbia, 685 F. Supp. 2d 104, 112 (D.D.C. 2010) ("In determining the applicability of qualified privilege, the District of Columbia courts use the same objective reasonableness standard applicable to qualified immunity under § 1983."); and any tort claims against any federal defendants because they would be barred by failure to exhaust and failure to name a proper party, McNeil v. United States, 508 U.S. 106, 107 (1993) ("The Federal Tort Claims Act (FTCA) provides that an 'action shall not be instituted upon a claim against the United States for money damages' unless the claimant has first exhausted his administrative remedies."); Welsh v. Hagler, 83 F. Supp. 3d 212, 223 (D.D.C. 2015) ("Under the FTCA, 'the United States is the only proper party defendant.'" (citation omitted)).  And the FAAA claim would have failed because the FAAA does not apply on Capitol grounds.  See Christmann, 2024 WL 216726, at *9.